# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

No. 20-1763V

| | |
|---|---|
| JACLYN MCNALLY, | Chief Special Master Corcoran |
| Petitioner, | Filed: July 31, 2024 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Renee Ja Gentry*, The Law Office of Renee J. Gentry, LLP, Washington, D.C., for Petitioner.

*Camille Michelle Collett*, U.S. Department of Justice, Washington, DC, for Respondent.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**[1]

On December 4, 2020, Jaclyn McNally filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received in her left shoulder on December 7, 2019. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons set forth below, I find that evidence preponderates against the conclusion that the flu vaccine administered in Petitioner's left deltoid caused any reduced range of motion—

---

[1] Because this Fact Ruling contains a reasoned explanation for the action in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Fact Ruling will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

meaning a Table claim is not viable (although Petitioner may be able to succeed under a causation-in-fact theory).

## I. Relevant Procedural History

As noted above, the case was initiated in December 2020. More than a year later, on January 28, 2022, Respondent filed a status report stating that he was willing to entertain settlement discussions, but those efforts did not succeed. ECF Nos. 25, 28.

Accordingly, on May 20, 2022, Respondent filed a Rule 4(c) Report disputing Petitioner's entitlement to a Vaccine Program award. Respondent's Report at 1. ECF No. 30. Respondent specifically asserts that Petitioner failed to establish that she suffered a Table injury because "there is no record evidence that [P]etitioner had range of motion ["ROM"] deficits in her left shoulder post vaccination." Rule 4(c) Report at 5.

In a Scheduling Order issued on August 1, 2022, I expressed the view that a hearing would not be necessary to resolve this dispute, and that I intended to issue a fact finding after providing the parties an opportunity to file briefs and any evidence they wished to have considered. ECF No. 31. On September 15, 2022, Petitioner filed her brief regarding range of motion. ECF No. 33 ("Br."). On October 31, 2022, Respondent filed his responsive brief. ECF No. 34 ("Opp.").

## II. Issue

At issue is whether Petitioner experienced limited ROM in her left shoulder. 42 C.F.R. §100.3(c)(10)(iii) (pain and range of motion limited to vaccinated arm requirement).

## III. Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL

6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19.

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

Special masters are obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### IV. Relevant Factual History

I have reviewed all the records filed to date. This ruling is limited to determining the scope of Petitioner's symptoms. Accordingly, I will only summarize or discuss evidence relevant to the resolution of this issue.

#### A. Medical Records

- Petitioner was administered the flu vaccine on December 7, 2019, at a CVS pharmacy. Ex. 1 at 3. Filed records state that the vaccine was administered in Petitioner's left deltoid. *Id.*

- On December 19, 2019 (12 days post-vaccination), Petitioner saw orthopedist Dr. Nathan Wetters, reporting "increasing pain [and] immobility in left shoulder." Ex. 2 at 3. Treatment notes state that Petitioner had constant pain, throbbing, and aching since her flu vaccine, which had worsened over time. *Id.* at 9. She also was experiencing "increase in her pain level *with overhead use*, throwing, and lifting." *Id.* (emphasis added).

- Exam notes, however, stated that Petitioner had "pain with terminal forward elevation, but normal range of motion with forward elevation of 170°, external rotation to the side of 70°, and internal rotation to the thoracolumbar junction." Ex. 2 at 10. She was thus reported to have "a positive Neer's impingement test, positive Hawkins sign, negative O'Brien's sign, and negative Speed's test."[3] *Id.* Dr. Wetters' assessment on examination was that Petitioner suffered from "inflammatory subacromial bursitis in left shoulder." *Id.*

- Petitioner had two subsequent treater visits (in January and March 2020) for issues unrelated to her shoulder pain complaints. Ex. 6 at 32–34, 36–38. She did not report symptoms relevant to this claim at these visits.

- On June 24, 2020 (now approximately six months post-vaccination), Petitioner had a remote, telehealth visit with Dr. Wetters (due to the Covid-19 Pandemic). Ex. 2 at 11. Petitioner still reported pain and reduced range of motion in left shoulder, and had been preforming at home physical therapy. *Id.* at 11. Visit notes state that she had "pain mostly with overhead use of the arm and she is experiencing significant fatigue after a period of left upper extremity use." *Id.* Although Dr. Wetters had previously recommended an additional MRI, it was denied by Petitioner's insurance "due to lack of conservative treatment." *Id.* He re-ordered the MRI, and planned to make further determination of her treatment options based on the results. *Id.*

- A new MRI was ordered and performed on June 29, 2020. Ex. 2 at 8. On July 9, 2020, Petitioner returned to Dr. Wetter's office in-person. *Id.* at 12–13. On exam, Petitioner displayed "full forward elevation with minimal pain at 160°" and "70 of external rotation to the side, but reproduction of her posterior shoulder pain at extreme external rotation." *Id.* at 12. In addition, review of the MRI results revealed "evidence of inflammatory response at the insertion as well as in the tendon of the teres minor posteriorly in the greater tuberosity." *Id.* at 13. Petitioner received a second cortisone injection, a prescription for Voltaren Gel and was recommended additional physical therapy. *Id.*

---

[3] Respondent explains that these tests "measure impingement, which occurs "[w]hen you raise your arm to shoulder height, the space between the acromion and rotator cuff narrows. The acromion can rub against (or impinge on) the tendon and the bursa, causing *irritation and pain*."" Opp. at 6 (emphasis added).

- Thereafter, Petitioner saw an orthopedist again in January 2021 for foot pain, but did not at this time mention her prior shoulder complaints. Ex. 11 at 3–5. Petitioner has not filed any additional records establishing further treatment relevant to this case.

### B. Petitioner's Declaration

Petitioner's brief contends that she "was a physically fit person who engaged in regular strenuous exercise". Br. at 2. Although her medical records showed "normal" range of motion, she states in her declaration that she had difficulty in performing everyday tasks and had limited mobility in her shoulder. *Id.;* Ex. 8 at 1-2. The limited mobility has caused her to modify her workouts, miss out on activities with her children and, at this point, she is even unable to pick up her children. *Id.* Petitioner goes on to describe a type of "depression" the injury has caused her and that the injury "truly negatively impacted all aspects of my physical and mental well-being and I unfortunately see no end in sight." *Id.* at 2.

### C. Parties' Arguments

Petitioner's memorandum likens her case to that of the claimant in *Zastrow v. HHS.*, No. 19-1536V, 2022 WL 2303971 (Fed. Cl. Mar. 15, 2022), in which an ROM dispute was resolved in favor of the relevant petitioner. Br. at 1–2. The *Zastrow* special master placed significant weight on the statements in Petitioner's affidavit, in which she described difficulties in daily activities due to decreased ROM. Thus, Ms. McNally highlights the entries in her pain log and declaration described above, as well as Dr. Wetters's notes stating that Petitioner had "increasing pain and immobility" and "pain with terminal forward elevation." *Id*. at 3. Further, she notes that the limited amount of evidence of ROM issues is attributable in part to the fact that she had fewer in-person treater visits due to the Covid-19 Pandemic. *Id*. at 4.

In reaction, Respondent argues that there "is a lack of evidence that petitioner experienced limited range of motion, and therefore cannot meet the QAI for SIRVA." Opp. at 2. He argues, on the contrary (and even if there is sufficient evidence that Petitioner experienced pain, including pain on movement of her shoulder), that objective record evidence suggests Petitioner's ROM remained normal. *Id.* at 5. Thus, Petitioner's orthopedic specialist, Dr. Wetters, documented that petitioner maintained "normal range of motion with forward elevation of 170°, external rotation to the side of 70°, and internal rotation to the thoracolumbar junction." *Id.* (emphasis added). To the extent Petitioner *contends* she did experience range of motion limits, Respondent notes that such assertions lack record corroboration. *Id.* at 6. And Respondent distinguishes *Zastrow*, arguing that in that matter the petitioner was able to marshal additional objective evidence of ROM limitations, in the form of both a medical record plus an expert opinion. Opp. at 4.

5

## ANALYSIS

Overall, the record preponderates against the finding that Petitioner experienced the required ROM limitations to meet that element of a Table SIRVA. At best, Petitioner may have initially *reported* ROM issues, at her first visit to Dr. Wetters—but this complaint was not corroborated by any actual exam. Indeed, no ROM limits were demonstrated at *any* of Petitioner's in-person visits with Dr. Wetters. Otherwise, Petitioner only displayed pain *with* shoulder movement. While pain is an independent SIRVA element easily established on this record, the ROM requirement is specific to movement *limitations*, as opposed to pain *due* to motion. 42 C.F.R. § 100.3(c)(10). This is consistent with Respondent's definition of ROM limitations. Opp. at 1 n.1, 2 n.2.

Petitioner's arguments to the contrary are unpersuasive. She contends, for example, that testing relevant to impingement performed in December 2019 was positive with respect to ROM. Br. at 4 (*citing* Ex. 2 at 10). But all such testing involves the association of pain with movement, as opposed to focusing on evidence of an inability to move the shoulder *per se*.[4] Petitioner also has offered her own witness statement evidence, or contemporaneous "pain logs," to document the existence of ROM limits. Ex. 9 at 1–3, 6. But these assertions lack record corroboration. And although *other* petitioners may have overcome ROM disputes in other cases, such as in *Zastrow*, that did not occur under the existing record herein.

As a general matter, the ROM limitation element of a SIRVA claim is not difficult to meet. For example, a petitioner need not show onset of ROM issues within 24 hours of vaccination, unlike pain. *Schoenborn v. Sec'y of Health & Hum. Servs.*, No. 21-0227V, 2024 WL 1342999, at *7 (Fed. Cl. Spec. Mstr. Feb. 28, 2024). Indeed, I have ruled that ROM limits can be established to have begun *outside* the six-month post-onset severity period and still satisfy this Table element. *Dawson v. Sec'y of Health & Hum. Servs.*, No. 19-278V, 2021 WL 5774655, at *4 (Fed. Cl. Spec. Mstr. Nov. 4, 2021) ("[h]owever, assuming that there is a requirement that a Petitioner must manifest reduced range of motion to meet the Table criteria for SIRVA, *no time period is set forth in which Petitioner must manifest reduced range of motion*") (emphasis added). Otherwise, *some* objective evidence of ROM limits must be demonstrated—and they have not been on the basis of this record.

Despite the above, it is more than conceivable that a causation-in-fact claim based on the facts in this record could succeed. Many of the other SIRVA Table elements seem to be met, and some kind of bursitis-like injury not involving ROM limitations might be tenable. I also observe that this case does not appear to be one involving significant damages—no surgery occurred (at least based on the existing record), and the injury timeframe only seems to barely cross the six-month severity "finish line." To that end, I urge the parties to consider settlement for a *very* nominal amount one last time, rather than spend another two to three years litigating this case.

---

[4] *See* n.3 above for Respondent's explanation of these tests.

## CONCLUSION

**On or before August 14, 2024, the parties shall contact staff attorney Stacy Sims to schedule a status conference,** at (202) 357-6349 or stacy_sims@cfc.uscourts.gov.

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master